### THE RIVERSIDE.

(District Court, E. D. Pennsylvania. October 22, 1913.)

#### No. 46 of 1912.

COLLISION (§ 102*)—STEAM VESSELS MEETING—FAILURE TO KEEP LOOKOUT.

A collision in the Delaware river opposite Philadelphia in the evening between a steamer and tug meeting *held*, on conflicting evidence, due to the fault of both vessels in failing to keep proper lookouts or to note each other's approach until they were so near each other that the danger was apparent and a confusion of signals resulted.

[Ed. Note.—For other cases, see Collision, Dec. Dig. § 102.*]

In Admiralty. Suit for collision by the Atlantic Refining Company, owner of the tug Imperator, against the steamer Riverside; Chester Shipping Company, claimant. Decree dividing damages.

Howard M. Long, of Philadelphia, Pa., for libelant.

Lewis, Adler & Laws, of Philadelphia, Pa., for respondent.

J. B. McPHERSON, Circuit Judge. About half past 7 o'clock in the evening of September 9, 1912, a collision took place on the Delaware river near Jackson street, Philadelphia, between the tug Imperator, owned by the Atlantic Refining Company, and the steamer Riverside, a boat belonging to the Chester Shipping Company. The tug was severely injured and sank in a very short time. She was afterwards abandoned as a total loss, but as she obstructed navigation the government removed her. After she was raised, the libelant took several photographs in order to show the extent and position of her wound. The night was dark but clear, and the tide was slack water ebb. A light southwest wind brought a little smoke from the city, but this did not interfere with the seeing of lights at a safe distance. Neither the wind, nor the tide, nor the condition of the atmosphere, had anything to do with the collision. The proper lights were set and burning upon both vessels. The tug had left Pier 53 at Washington avenue, a mile or more north of Jackson street, and was bound south

to Point Breeze in the Schuylkill river to tie up for the night. She had no tow and her speed was about 9 miles an hour. The steamer was bound north from Chester to her wharf at Arch street, Philadelphia, and her speed was about 13 miles an hour. The steamer is considerably larger than the tug, the latter being 90 feet long, while the length of the former is 141 feet, her other dimensions also being larger than the tug's. The steamer carries freight between Chester and Philadelphia; the tug is exclusively engaged in harbor service.

As usual, the two groups of witnesses are in sharp conflict, and I may say immediately that after hearing them testify I cannot rely wholly on either group. Neither account is credible in several particulars, and I find it much more satisfactory to start from certain physical facts that cannot be denied; I rely upon these with more confidence than upon much of the oral testimony. The first fact is the place where the tug sank; and the other facts are the nature and the position of the wound in her side. She sank upon the western or Pennsylvania side of the channel; a survey taken not long after the collision shows the point of submergence to be 450 feet from the western bulkhead line of the river; and the photographs taken after she was raised show that she was struck upon the starboard side not much aft of amidship, and that the blow was severe enough to break a hole about 8 feet wide, that extended several feet into the hull. With such a wound she could not have kept afloat more than a few minutes, even if the steamer's bow had been held in the break; this expedient would have had some effect, but not much, in keeping the water out. Now, as the tug sank 450 feet from the Pennsylvania side of the river, the first inquiry is: How did she get there? The steamer's explanation must be rejected. She declares that the collision took place far over on the New Jersey side of the river—indeed, actually in the anchorage ground—and she accounts for the sinking on the Pennsylvania side (which would undoubtedly call for explanation) by putting forward the theory that both vessels maintained full speed during and after the collision, and that the tug, although she was the lighter of the two vessels and although she was hanging broadside upon the bows of the steamer and was barely kept afloat, nevertheless forced the heavier vessel around in an almost complete circle, and then (apparently becoming inert) was herself pushed in a sinking condition 900 or 1,000 feet across the river to the place near the Pennsylvania shore where she finally succumbed. As already stated, I cannot accept such an explanation; it is improbable in a marked degree, and I shall not discuss it further.

In this connection I may add that another part of the steamer's testimony is also difficult to believe, namely, the assertion that shortly before the collision the tug was in such a position that the steamer could not see her green light, the red being the only sidelight visible, and that the tug's course was suddenly changed so completely that her red light was shut out and the green light alone came into view. This means that from a position of safety the tug, with no apparent reason, attempted to cross the river, taking a course across the bows of the steamer, and thus assuming a position of manifest danger. No

doubt this is possible; so is any whim or caprice, but the probabilities of ordinary conduct are against it, and since the testimony does not clearly support it I feel bound to reject it as unlikely.

The tug's account also is improbable. She declares that when she first saw the steamer the latter's green light alone was visible. This means that the steamer was heading toward the Pennsylvania side of the river, and therefore was going where she had no apparent motive and no business to go. This also may be described as possible, but unlikely; it does not square with ordinary conduct, and (in the absence of clear supporting testimony) I must decline to accept it. In this difficulty, if we turn for help to the physical facts of the situation, we find it to be certain that the tug was struck a severe blow upon the starboard side, and inspection of the wound shows that the blow was delivered nearly at right angles. In other words, the tug must have been crossing the bows of the steamer when the collision took place—although I do not think that this maneuver was undertaken upon a sudden caprice, as the steamer would have us suppose. In my opinion the undeniable physical facts (which must be accounted for) can only be explained reasonably by declining to accept the unlikely statements in the testimony offered by either vessel. As it seems to me—and I have considered and reconsidered all the evidence—the probable facts to be extracted from the mass of contradiction are these:

The tug was going down the river upon the Pennsylvania side of the channel; this is the course she would naturally choose, not only because the Pennsylvania side was the proper side, but also because it was the shortest road to her destination. As the steamer was bound to her dock—which was not in New Jersey, but in Philadelphia—we may conclude with probability that she was not skirting the New Jersey shore, but had come as near the Philadelphia side of the river as she dared. In any event, I am confident that she was not where she puts herself—so far over on the New Jersey side of the channel that a slight change of course took her into the anchorage ground. And if this part of the testimony is not to be trusted, it casts some doubt on other parts. In a word, the two vessels were approaching each other nearly head on—and it is worth noting that each says so, in some part of the testimony—and were therefore in a position where each not only could see, but where each did see, both sidelights of the other. I am satisfied also that, if there was a lookout at all upon the tug, he was inattentive; no doubt there was a deck hand near the bow, but it is not clear that he was stationed there as a lookout; and in any event if he did see the lights on the steamer at a proper distance he failed to report them. It is also probable from the steamer's own testimony that she failed to see, or at least failed to note, the lights upon the tug until the two vessels had come closer than was safe. I think therefore that each appears to have been at fault in failing to make timely discovery of the other. When the approaching lights were at last taken note of, both vessels were naturally much perturbed, not to say, flustered. The master of each was in the pilot house and had charge of the wheel, and the only reasonable explanation of the conflicting testimony concerning the whistles is that in the hurry and alarm of the

situation the passing signals were not properly given and answered, but were crossed. But I do not think it material to decide which vessel may have been most, or altogether, at fault in this respect; both were equally at fault in getting into the original position of danger, where the crossed signals were a not unnatural sequence, and I do not think it vitally important to lay the blame of the misleading signals on the shoulders of one rather than of the other. Neither vessel blew danger signals, nor reversed, so that neither adopted a course that is often of great value and is sometimes imperative. I can understand that when the steamer was forced to a quick decision she believed the best way out of the difficulty would be to keep her speed and try to pass port to port, while the tug, being in a similar strait, might also believe it best to keep her speed but to try to pass starboard to starboard. I think the master of the tug did give the starboard signal, and certainly the master of the steamer did give the port signal. But, as I have already said, it is not necessary to decide which signal was given first, or which vessel crossed the signal, for the mischief had already been done, and the confusion of signals did not cause the collision, although it may have taken away whatever possibility of escape still existed. The tug's effort to pass starboard to starboard was ill advised, and turned out to be fatal. I think it was a second fault on her part, although it is easy to understand why it was done; but it should not charge her with all the blame, since both vessels were primarily in the wrong. Neither of them took the needful precautions to avoid getting into dangerous proximity, and what happened afterwards was a result that often follows and should have been foreseen.

A somewhat different view of the situation may be taken, but the conclusion will not be changed. It is possible that each vessel saw the other, not relatively close at hand, but as far away as 1,000 or 1,500 feet. This is a safe enough distance when the usual care is taken. But even if this be true, I have no doubt that the collision was caused by each vessel holding her course too long without blowing promptly the proper signals and without making the proper effort to pass while the vessels were still a safe distance apart. This is a continually recurring fault, this effort of one vessel to make the other give way, and it is my experience that probably no other cause of collision is so fruitful. I state this alternative view of the testimony because it accounts for the dangerous proximity of the vessels, and for the final difficulties of the situation, as well as the view I have first stated; but to my mind the first view is the more probable. But in either event a perilous situation was brought about by the concurring fault of both vessels, and both are therefore liable.

My conclusion is that the damages should be divided. As the parties were not prepared at the hearing to offer testimony concerning the amount of the loss, that inquiry may be held hereafter, either in open court or before a commissioner, as Judge Thompson may prefer.

A decree in accordance with this opinion may be entered.